Filed 2/27/13  In re M.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re M.G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E057101 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J233562, J233563) |
| v. | **OPINION** |
| U.G., Sr., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Kristina M. Robb, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and Respondent, U.G., Sr. (Father), appeals after the termination of his parental rights to minors U.G., Jr., and M.G. at a Welfare and Institutions Code section 366.26[1] hearing.

Father claims in this appeal that clear and convincing evidence did not support the juvenile court's finding that the children were adoptable.[2]

We find no error.

I

PROCEDURAL AND FACTUAL BACKGROUND

A.    *First Detention*

On June 18, 2010, 4-year-old U. and 2-year-old M. were taken into protective custody by the San Bernardino County Department of Children and Family Services (the Department). On that day, San Bernardino County Sheriff's Deputy Williams responded to the residence of Mother and Father on reports that the children were dirty and playing outside unsupervised. When Deputy Williams arrived, he found that the house had no running water and the toilet was filled with feces. Further, there were dirty dishes, spoiled food and clothing strewn throughout the residence. Father and Mother both appeared to be under the influence of drugs and admitted to using drugs within the previous 24 hours. Baggies that appeared to contain methamphetamine residue were

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]  S.T. (Mother) does not appeal the termination of her parental rights.

found in the house. Mother and Father were arrested on child endangerment charges. The children appeared dirty but not hungry.

Mother was interviewed at the jail. She admitted regularly using methamphetamine and marijuana but claimed she took care of her children. She had been using drugs since she was 14 years old and had never received any treatment. Mother claimed the water had been turned off by the landlord in order to get her to move out. Mother and Father were not married.

Father was also interviewed. He did not live with Mother and the children. He claimed that, since he did not live at the location, he knew nothing about the baggies with methamphetamine. He denied he had a drug problem; he used medicinal marijuana for an injury. He used a "little" methamphetamine.

The maternal grandmother and paternal grandfather expressed an interest in caring for the children, but due to other adults living in their residences who could not pass the criminal background check, they could not take custody of the children.

On June 22, 2010, the Department filed section 300 petitions against Mother and Father for the children, alleging a failure to protect (§ 300, subd. (b)) due to substance abuse and Mother keeping the home in deplorable condition; and it was alleged against Father and Mother that they could not provide support (§ 300, subd. (g)) due to their incarceration.

The juvenile court found a prima facie case and ordered that the children be detained and remain in the custody of the Department.

B.    *First Jurisdiction/Disposition Report and Hearing*

In a jurisdiction/disposition report filed on July 13, 2010, the Department recommended that reunification services be granted to Mother and Father.  Father admitted he was the biological father, and the Department recommended that he be named the presumed father.

Mother was interviewed on July 7, 2010.  She admitted the allegations in the petition.  She and Father were getting "high" when Deputy Williams arrived at their home.  Mother understood what she did was endangering her children.  Father denied that they were smoking methamphetamine when Deputy Williams arrived but admitted he was smoking the previous night.

Mother had another child, six-year-old G.T., who was under a guardianship with his paternal grandmother in Riverside County.  G.T.'s father was incarcerated, and Mother had met him while doing drugs on the street.  Mother did not complete high school and had no known work history.

Both Mother and Father wanted to receive drug treatment.  Mother had a prior conviction for grand theft of personal property in 2007.  She was currently charged with cruelty to a child and being under the influence of a controlled substance, for her actions at the time of the children's detention.  Father had a prior conviction for battery on a spouse or cohabitant in 2005.

Father was born in Cuba and had immigrated to the United States when he was six years old.  His father was a political prisoner from Cuba.  Father could not return to Cuba

4

because of his father. Father would likely be kept in custody on an immigration hold. Father was close with his family. He recognized that he was a disappointment to his parents. He had been involved in a gang until his brother was killed by a gang.

M. appeared to be developing normally. She was a happy girl. She showed no signs of distress and had adjusted well to her foster care. U. also appeared to have no known medical or dental concerns. He played well with M. He showed no signs of distress.

The maternal grandmother could not take the children because her husband had a criminal history, her home was too small, and she expected to be working full time. A paternal aunt was being evaluated for placement.

The jurisdictional/dispositional hearing was called on August 11, 2010. Father waived his right to a hearing so that he would not have to make a further appearance. The section 300, subdivision (g) allegation was amended to strike the language that Father was arrested for child endangerment. The matter was continued.

At a second hearing conducted on September 21, 2010, Father was not present as he was enrolled in a drug rehabilitation program. Mother was present. The paternal grandparents and maternal grandmother were also present. Mother waived her rights to a hearing. Mother was attending an inpatient drug treatment program. Father was named the presumed father.

The juvenile court found the section 300, subdivision (b) allegations against Mother and Father true. The Court also found the section 300, subdivision (g) allegation

5

true against Father but struck the allegation against Mother. Mother was scheduled to complete her inpatient program and was moving into a sober living facility. Father and Mother were granted reunification services.

C. *Six-month Review Report and Hearing*

According to a status review report filed on March 9, 2011, the Department was recommending that the children be returned to Mother's custody under a family maintenance program and that reunification services be continued for Father. Mother was living in a sober living facility. She regularly visited with the children. Mother had been sober for 122 days. Mother would move to a sober living facility that allowed children if they were returned to her. Maternal grandmother was helping Mother. Mother had no contact with Father and was not planning to resume their relationship.

Father had remained incarcerated during the reporting period on an immigration hold; he had not reported that he had completed any of his case plan and had sent no letters to the children. On February 16, 2011, Father was released to border patrol agents, and his whereabouts were unknown.

M. was developing normally and was healthy. She had no behavioral problems and played well with other children in the foster home. U. had no developmental delays or health problems. He was reported by the foster parents to be a sweet and affectionate boy.

6

Mother had participated in all of her services and drug treatment. The children were staying with Mother every other weekend and visiting for several hours during the week. The visits were going well. The children wanted to return to live with Mother.

At the hearing on March 21, 2011, both Mother and Father were present. The juvenile court adopted the recommendation of the Department placing the children back in the custody of Mother with family maintenance (contingent upon her remaining in sober living) and continued reunification services for Father.[3]

D. *Supplemental Petition Pursuant to Section 387*

On May 6, 2011, a supplemental petition was filed pursuant to section 387. On March 21, 2011, the children were returned to Mother's custody. On May 2, 2011, Mother had been on a weekend pass outside the sober living home. When she returned, she was under the influence of methamphetamine. It was discovered that Mother had also used methamphetamine on a prior occasion. She used her money to buy the drugs while other residents of the sober living facility bought groceries for the children. Mother had used the drugs in the presence of the children. Mother would not be approved for sober living with her children. Father's whereabouts were unknown.

A detention hearing was conducted on May 9, 2011. Mother was present in court; Father was not. Mother and Father's counsel admitted the allegations in the supplemental petition. Mother was intending to reenter an inpatient treatment program.

---

[3] A judge pro tempore was appointed for this hearing with the consent of the parties.

Mother requested that the maternal grandmother be considered for placement. The juvenile court found that a prima facie case was established for out-of-home detention. It approved of relative assessment for placement of the children.

E.     *Second Jurisdiction/Disposition Report and Hearing*

On May 25, 2011, the Department filed a second jurisdiction/disposition report. The children were placed in a different foster home than the one they were placed before their return to Mother.

Mother was living with the maternal grandmother and was unemployed. She had continuing visitation with her other son, G.T., who was living with his paternal grandparents. G.T. had a relationship with his siblings. Father's probation officer stated that Father had been deported on February 16, 2011. He was on formal probation until 2013. It was discovered that he also had prior convictions in 2005 and 2008 for possession of marijuana and in 2009 for carrying a dirk or dagger, in addition to the spousal abuse in 2008.

Both children were developing normally and were healthy. Although the maternal grandmother was assessed for placement, she declined placement. She was unable to care for the children. Further, Mother was living with her. Father had made no visits with the children. Mother's one visit during the reporting period was appropriate.

Mother did not voluntarily consent to adoption planning. She was advised that if reunification failed adoption would be recommended.

8

The second jurisdictional/dispositional hearing was held on June 30, 2011. Mother and Father (despite being deported) were present. The juvenile court found the allegation in the section 387 petition true after Mother admitted the allegation. Mother and Father were given continued reunification services.

F. *18-month Status Review Report and Hearing*

On December 6, 2011, the Department filed a status review report pursuant to section 366.22. The Department had been unable to contact Father, he made no visitation with the children, and he completed no services. Mother had completed an outpatient substance abuse program. Approximately three months after the last hearing, Mother had moved in with a man she had met in a substance abuse facility. Mother did not contact the Department for some time and did not give adequate information, once she was contacted, regarding her boyfriend. The boyfriend was arrested in October 2011 because he had "pills" in the apartment, which violated his parole, and Mother was present when he was arrested. She hoped to take over the apartment, which was in the boyfriend's name. The apartment contained no furniture except for one mattress on the floor. Mother admitted that her living situation was detrimental to her receiving custody of her children. She had tested negative for drugs on several occasions.

Visitation between Mother and the children was deteriorating. U. frequently did not want to attend the visits and wanted to leave early. Mother would allow the children to leave after just 15 to 20 minutes of visitation. Further, since Mother had moved in with her boyfriend, she had changed.

9

U. had started kindergarten and was behind academically but was making progress with the assistance of the foster mother and the teacher. There was concern that U. was suffering from developmental delays, but they seemed to only be academic. The children had bonded with the foster mother and adjusted well to their new home. M. was developmentally and physically on target for her age. U. had panicked when the foster mother was packing his bag for a trip, thinking he had to return to Mother's care. Out-of-state placement with their paternal great-aunt had not been approved.

The Department recommended that reunification services be terminated. It recommended adoption by the current foster mother.

On January 24, 2012, additional information was submitted to the juvenile court. Mother had lost her job and was being evicted. As of January 31, 2012, she would have no place to live. She was continuing her relationship with her boyfriend, who was out of jail. She acknowledged she would not be getting back custody of her children.

A contested review hearing was conducted on January 26, 2012. Father was not present; Mother was. They objected to termination of reunification services but presented no evidence. Reunification services for Mother and Father were terminated, and a section 366.26 hearing was set.

G.     *Section 366.26 Report and Hearing*

The section 366.26 report was filed on May 7, 2012. The recommendation by the Department was termination of parental rights and adoption. At the time of the report, U.

was five years old and M. was four years old.  The children had been in their current placement since May 4, 2011.

M. was reported as a happy and outgoing child.  She was developing normally, loved to go to the mall, and play with her dolls.  U. was reported to be "a little" behind developmentally.  U. was described as "very lazy."  He would lie on occasion to get out of trouble.  He was a great sharer.  His teacher reported that U. was immature, and his fine motor skills were lacking.  He had problems socially.  He was being assessed to repeat kindergarten.  U. also was having behavioral problems in class, but the teacher and foster mother were working on them.  The children called the foster parents mommy and daddy.  They were both on target emotionally.  U. felt betrayed by Mother, who had promised when they were returned to her that they would never have to leave her again.  Mother had only showed up for one of the last five visits.

The current foster family was not interested in adopting the children, so a home was being sought for both of them.  At the time of the report there was no identified adoptive family.  The children would be adopted as a sibling set.  The Department indicated it had assessed all possible relatives for placement, and none had been approved.  The social worker who prepared the report stated that the children "are very much adoptable.  Considering the instability in their lives they are amazingly resilient."

At a hearing on May 24, 2012, the Department sought a continuance in order to find an adoptive family for the children.  At the hearing the paternal grandfather asked that the children be placed with his brother and his wife; the paternal grandfather and his

11

wife would also help to care for them. The Department stated for the record that the paternal grandfather had previously given the names of several persons who could care for the children, but they could not be approved for placement. This was the first time that the paternal grandfather had mentioned his brother for potential placement. The paternal grandfather objected that the names previously given to the Department had been rejected. He offered that the Department could investigate him and his wife. The juvenile court approved that a new home be found for the children.

On July 19, 2012, it was reported that a nonrelative adoptive home was found for the children. They had been placed with the adoptive parents for two weeks and were making a good adjustment to the home.

The contested section 366.26 hearing was conducted on August 28, 2012, as will be discussed in more detail, *post*. Mother and Father were present. The trial court terminated parental rights, freeing the children for adoption. The juvenile court found there was clear and convincing evidence that the children would likely be adopted.

Father filed an appeal from the section 366.26 hearing.

II

PERMANENT PLAN OF ADOPTION

Father contends that the juvenile court erred by finding by clear and convincing evidence at the section 366.26 hearing that the children were adoptable.

12

A.    *Additional Factual Background*

At the section 366.26 hearing, Father objected to the termination of his parental rights and freeing the children for adoption.  He indicated he had not participated in his case plan or visitation because he had been incarcerated throughout the dependency proceedings.  He requested that a legal guardianship be considered.  He wanted an opportunity to parent the children at some point.  Mother claimed that she had a bond with the children and objected to the termination of her parental rights.

The juvenile court stated, "When there is clear and convincing evidence that the children will be adopted, the Court is required to take that course, unless one of the exceptions is shown.  [¶]  There are no exceptions in this case.  The Court will follow the [Department's] recommendations."  The juvenile court found there was clear and convincing evidence the children would be adopted, and terminated the parental rights of Mother and Father.

B.    *Analysis*

At the section 366.26 hearing, the juvenile court, after terminating reunification services, "determines whether the child is adoptable on the basis of clear and convincing evidence.  [Citations.]"  (*In re Josue G.* (2003) 106 Cal.App.4th 725, 732; § 366.26, subd. (c).)  "Adoption, where possible, is the permanent plan preferred by the Legislature.  [Citation.]"  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)  The focus of the court's inquiry is on the child, "and whether the child's age, physical condition, and emotional state may make it difficult to find an adoptive family.  [Citations.]"  (*In re Erik P.* (2002)

104 Cal.App.4th 395, 400; see also *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) A proposed adoptive parent need not be identified and ready to adopt, but "there must be convincing evidence of the likelihood that adoption will take place within a reasonable time. [Citation.]" (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624.)

The clear and convincing evidence standard is a low threshold. "The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time. [Citations.]" (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.) "We review that finding only to determine whether there is evidence, contested or uncontested, from which a reasonable court could reach that conclusion. It is irrelevant that there may be evidence which would support a contrary conclusion." (*Ibid.*) In other words, on appeal, "the clear and convincing test disappears and 'the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1526.) We presume in favor of the order considering the evidence in light most favorable to the prevailing party. (*Id.* at p. 1525.)

We find there is substantial evidence, supported by the record, that the children were properly deemed adoptable by the juvenile court. Here, adoptive foster parents for the children were found two months prior to the section 366.26 hearing. It was reported that the children were adjusting well to their adoptive home. Although a finding of adoptability does not require a showing that a particular person wants to adopt the child, the existence of prospective adoptive parents serves as "evidence that the child's age,

14

physical condition, mental state, and other relevant factors are not likely to dissuade individuals from adopting the child." (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1311-1312.) The fact that there was an adoptive family ready to take custody of the children was strong evidence that they were likely to be adopted.

Even if the adoptive family chose not to take the children, there was evidence that they were adoptable. At the time of the section 366.26 hearing, U. was five years old and M. was four years old. M. was described throughout the Department's reports as a happy and outgoing child. She was developing normally and had no delays. She certainly had no physical or mental condition that would dissuade anyone from adopting her.

In the beginning of the process, U. had no reported developmental delays and was adjusting well to his situation. He was reported as a sweet and affectionate boy. Toward the end of the process, U. started to show some impact from his circumstances. He no longer wanted to attend visits with his mother and felt abandoned by her. He had started kindergarten, and it was discovered he had some academic delays. U. was having some behavioral problems in class, but they were being addressed. He also was described as a great sharer.

Understandably, considering the circumstances, U. had some academic and behavioral problems based on his situation. However, these did not rise to the level that no one would adopt him. In *In re Helen W.* (2007) 150 Cal.App.4th 71, 75, 79-80, a foster mother's willingness to adopt a sister and brother was sufficient to support the juvenile court's finding of adoptability, although the sister suffered from various physical

15

and development conditions including autism and bipolar disorder and exhibited violent behavior. Here, U. was a sweet and affectionate boy who got along well with M., and M. was reported as a happy girl. Nothing in the record indicates that a family would not be willing to adopt the children.

Finally, the Department described the children as "very much adoptable" and "amazingly resilient." Both of the children had been able to handle the changes that occurred in their lives after being detained from Mother and Father, returned to Mother, and then detained again. They also endured different foster homes. Despite these changes, they remained happy children who had no serious developmental delays.

In his opening brief, Father stated that the children were not in a prospective adoptive home. He insisted they were still in the foster home where the parents did not want to adopt them, surmising it was based on U.'s emerging behavioral problems. In his reply brief, Father recognized that the children were placed in a prospective adoptive home but complained that there was no information regarding the success of that home or the progress of the adoption. However, specific adoptive parents are not required in order to find a child adoptable. (*In re A.A.*, *supra*, 167 Cal.App.4th at pp. 1311-1312.) The fact that there was a family who was interested in adopting the children was evidence that they were likely to be adopted.

Father also states that U. had "serious and broad spectrum problems." However, the record does not support that U. was suffering from major behavioral problems. U. was behind academically, but his problems were being addressed by the school. Further,

16

although he was exhibiting behavioral problems in class, they were never reported as serious problems. He was not listening, was writing on property, and had trouble with his homework, but he was not expelled from the classroom. He was reported to love school, and he was working with the teacher and foster mother to improve his behavior. Nothing in his behavior showed by clear and convincing evidence that he was not adoptable.

Based on the foregoing, there was substantial evidence presented that the children were likely to be adopted within a reasonable time.

## III

## DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
Acting P. J.

We concur:

KING
J.

MILLER
J.

17